# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CHESTER SAVOIE**                                    **CIVIL ACTION**

**VERSUS**                                            **NO. 14-30-JJB-RLB**

**CAROLYN W. COLVIN,**
**ACTING COMMISSIONER OF**
**THE SOCIAL SECURITY**
**ADMINISTRATION**

## <u>NOTICE</u>

Please take note that the attached Magistrate Judge's Report and Recommendation has been filed with the Clerk of the U.S. District Court for the Middle District of Louisiana.

Under 28 U.S.C. § 636(b)(1), you have **14 days** from receipt of this Notice to file written objections to the findings of fact and conclusions of law recommended by the Magistrate Judge. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME WILL BE GRANTED TO FILE OBJECTIONS TO THE REPORT AND RECOMMENDATION.**

Signed in Baton Rouge, Louisiana, on February 10, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

CHESTER SAVOIE                                              CIVIL ACTION

VERSUS                                                      NO. 14-30-JJB-RLB

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff, Chester Savoir (Plaintiff), seeks judicial review of a final decision of the

Commissioner of the Social Security Administration (Commissioner), pursuant to 42 U.S.C. §

405(g), denying Plaintiff's application for disability insurance benefits "under Title II and part A

of Title XVIII of the Social Security Act" (Tr. 124-25) and for supplemental security income

"under Title XIX of the Social Security Act" (Tr. 126-32).[1] For the reasons given below, the

Court recommends that the Commissioner's decision be **AFFIRMED** and Plaintiff's appeal be

**DISMISSED with prejudice**.

## I.      PROCEDURAL HISTORY

On February 10, 2011, Plaintiff filed applications for benefits alleging a disability onset

date of May 21, 2009. (Tr. 49, 62, 124, 126). The claim was initially denied (Tr. 47, 48) and

Plaintiff filed a timely request for a hearing that was held on July 24, 2012. (Tr. 20-44).

Plaintiff, represented by counsel, appeared and testified at the hearing. (Tr. 24-41). Mark Sheers,

a Vocational Expert (VE), also provided testimony. (Tr. 42-43).

---

[1] References to documents filed in this case are designated by: (R. Doc. [docket entry number(s)] at [page number(s)]). References to the record of administrative proceedings filed in this case are designated by: (Tr. [page number(s)]).

An unfavorable decision was rendered by the Commissioner, through the Administrative Law Judge (ALJ), on September 21, 2012. (Tr. 9-15). The ALJ found that Plaintiff had not been under a disability from the alleged onset date of May 21, 2009 through September 21, 2012, the date of the decision. (Tr. 15).[2] Plaintiff's request for review was denied by the Appeals Council on November 21, 2013. (Tr. 1-5). The ALJ's decision rested as the final decision when the Appeals Council denied Plaintiff's request for review. *See* 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you . . . file an action in Federal district court . . . ."). The ALJ's final decision is now ripe for review under 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" in the context of the National Labor Relations Act, 29 U.S.C. § 160(e)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quotations omitted). Conflicts in the evidence are for the Commissioner "and not the courts to

---

[2] The onset date was amended by Plaintiff to December 1, 2010. (Tr. 23, 231).

resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision. *See, e.g.*, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994) ("This is so because substantial evidence is less than a preponderance but more than a scintilla."); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) ("we must carefully scrutinize the record to determine if, in fact, such evidence is present; at the same time, however, we may neither reweigh the evidence in the record nor substitute our judgment for the Secretary's"); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (same).

If the Commissioner's decision is supported by substantial evidence, then it is conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000). If the Commissioner fails to apply the correct legal standards, or fails to provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

## III.    ALJ'S DETERMINATION

In determining disability, the Commissioner, through the ALJ, works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. If the claimant is successful in sustaining his or her burden at each of the first four steps, the burden shifts to the Commissioner at step five. *See Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (explaining the five-step process). First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove his or her impairment is "severe" in that it "significantly limits your physical or mental ability to do basic

work activities . . . ." 20 C.F.R. § 404.1520(c).  At step three the ALJ must conclude the claimant is disabled if he proves that his or her impairments meet or are medically equivalent to one of the impairments contained in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(d) (step three of sequential process); 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of Impairments).  Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his or her past relevant work.  20 C.F.R. § 404.1520(f).

If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he or she is capable of performing other work.  20 C.F.R § 404.1520(g)(1).  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, the ALJ issued an unfavorable decision based on the evidence contained in the administrative record.  Specifically, the ALJ found:

1.  Plaintiff met the insured status requirements of the Act through December 31, 2015.

2.  Plaintiff has not engaged in substantial gainful activity since the alleged onset date.

3.  Plaintiff had the following severe impairments: diabetes and amputation of toes on the left foot.

4.  Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the Listings, specifically Listing 8.04 (Chronic Infections of the Skin and Mucous Membranes) and Listing 11.14 (Peripheral Neuropathies).

5.  Plaintiff had the residual functional capacity to perform the full range of sedentary work.

6.  Plaintiff could no longer perform any past relevant work.

7.  Plaintiff was a younger individual between the ages of 45 and 49.

8.  Plaintiff had a high school education and was able to communicate in English.

9.  Application of the GRIDS meant the transferability of job skills was not material to the ultimate issue of disability.

10. Given Plaintiff's age, education, work experience and RFC, there were jobs existing in the national economy that he could perform.

(Tr. 11-14).

## IV.  DISCUSSION

On appeal, Plaintiff raises several assignments of error in support of his claim.  First, Plaintiff suggests the ALJ committed reversible error at Step 3 by failing to apply the proper legal standard and by not explaining his adverse finding. (R. Doc. 12 at 6).  Second, Plaintiff contends the ALJ failed to follow the proper legal standard in assessing his RFC and credibility, neither of which is supported by substantial evidence.  Next, Plaintiff argues the ALJ erred in applying the GRIDS at step 5, because the record shows that Plaintiff suffers from non-exertional impairments. (R. Doc. 12 at 7).  Finally, Plaintiff claims the Appeals Council "neglected to adequately evaluate new and material evidence properly submitted on appeal." (R. Doc. 12 at 7).

### A.  Appeals Council

Plaintiff first argues that the Appeals Council committed reversible error by not giving a written evaluation of new and material evidence submitted by Plaintiff—an October 18, 2012 letter from his treating podiatrist, Dr. Ly Vu. (Tr. 468-70).  Plaintiff asserts that the Appeals Council merely looked at the new evidence but did not explain why it did not warrant remand of Plaintiff's application to the ALJ.

If a claimant is "dissatisfied" with an ALJ's decision, he or she "may request" request review by the Appeals Council. 20 C.F.R. § 404.967.  When a claimant requests review, the Appeals Council "may deny or dismiss the request for review, or it may grant the request and

either issue a decision or remand the case to [the ALJ]." *Id.* The regulations specifically permit claimants to submit additional evidence, not before the ALJ, to the Appeals Council to consider along with the request for review. 20 C.F.R. §§ 404.968(a), 404.970(b). In those cases, the Appeals Council first determines if the submission is "new and material" evidence that "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b). For purposes of this appeal, the Court assumes Plaintiff's October 18, 2012 letter from Dr. Vu constitutes new and material evidence.

When confronted with new and material evidence, the Appeals Council then "evaluate[s] the entire record including the new and material evidence." 20 C.F.R. § 404.970(b). If the Appeals Council finds that the ALJ's conclusion is contrary to the weight of the current record evidence, it will grant the request for review and either issue a decision or remand the case to the ALJ. 20 C.F.R. §§ 404.967(b), 404.979. But if the weight of the evidence in the current record is still consistent with the ALJ's decision, the Appeals Council can simply deny the request for review.

Contrary to Plaintiff's contention, nothing in the Act or regulations requires that the Appeals Council explain its rationale for denying review. Instead, the Act does not require the Appeals Council to do anything more than what it did here — state that it considered new and material evidence in deciding whether to grant review. The Appeals Council's Order and Exhibit List specifically reference the material from Dr. Vu. (Tr. 4, 5). The decision of the Appeals Council stated "we considered . . . the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 1-2). Nothing more is required. *See Cantrell v. McMahon*, 227 F. App'x 321, 323 (5th Cir. 2007) (Appeals Council adequately considered

evidence submitted on appeal where "In its order, the Appeals Council specifically stated it had considered the additional evidence and found it did not warrant changing the ALJ's disability decision."); *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006) (finding "nothing in the statutes or regulations" requires the Appeals Council to explain its evaluation when "new evidence is submitted and the Appeals Council denies review"); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992) (rejecting argument that Appeals Council must "make its own finding" and "articulate its own assessment" of new evidence when denying review); *Damato v. Sullivan*, 945 F.2d 982, 988-89 (7th Cir. 1991) ("Since the . . . regulations do not require an explanation of the grounds for rejection, we hold that the Appeals Council may deny review without articulating its reasoning," even when new and material evidence is submitted.).

Although Dr. Vu's October 18, 2012 letter did not warrant relief by the Appeals Council, it was made part of the record. (Tr. 268-70). The Court must consider it, along with the record before the ALJ, when determining whether substantial evidence supports the final decision of the Commissioner. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).

## B.    Listing Analysis

Plaintiff's second assignment of error is that the ALJ's adverse finding at step 3 is legally deficient because the ALJ did not explain whether Plaintiff met or medically equaled Listings 1.05, 8.04 or 11.14, or otherwise consult a medical expert on the issue of equivalence. (R. Doc. 12 at 9).

At step three, the ALJ considers the severity of the claimant's impairments without regard to vocational factors. The ALJ applies the Social Security Administration's Listing of Impairments, which "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity,

regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). The criteria in the Listings are "demanding and stringent." *Falco*, 27 F.3d at 162. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment. A bare and summary conclusion that a plaintiff does not meet the criteria of any Listing is beyond meaningful judicial review. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). But, even if the ALJ fails to explain an adverse determination at step three, a reviewing court must still evaluate whether the error was harmless. *Audler*, 501 F.3d at 448.

Here, the ALJ summarily determined:

> The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . . Specific consideration has been given to Section 8.04 . . . and 11.14 . . . . The medical evidence documents no findings suggestive of the severity contemplated by these or any other listed impairments.

(Tr. 12). Despite Plaintiff's contention that he met Listings 1.05, 8.04 and 11.14, the ALJ made no mention of Listing 1.05 and failed to explain his adverse findings concerning Listings 8.04 and 11.14 or any other Listing at step 3 of the analysis. (Tr. 23). Plaintiff contends that this lack of explanation warrants relief, considering there is record evidence which appears to meet or medically equal each of these Listings. (R. Doc. 12 at 9).

The Court agrees with Plaintiff to the extent he argues the ALJ's lack of explanation was inappropriate. The ALJ fails to point to any supporting medical evidence, or otherwise explain his finding at step 3; this conclusory determination was in error. *See Audler*, 501 F.3d at 448.

Even still, to be entitled to relief Plaintiff must not only establish that the ALJ erred, but that this error casts doubt on the existence of substantial evidence supporting the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In other words, the Court must still determine whether that error was harmless. *Morris*, 864 at 334. Procedural perfection is not required in administrative hearings, and a court will not vacate a judgment unless "the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Thus, Plaintiff must establish that the ALJ's error at step 3 was not harmless because the record supports that he in fact meets Listings 1.05, 8.04 and 11.14. *See Morris*, 864 F.2d at 335.

Listing 1.05B concerns amputation of "[o]ne or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, which have lasted or are expected to last for at least 12 months." 20 C.F.R., pt. 404, subpt. P, app. 1 § 1.05. The "tarsal region" is more commonly referred to as the ankle.[3] Plaintiff cannot satisfy this Listing. By definition, the transmetatarsal amputation (TMA) of Plaintiff's left forefoot occurred below his ankle — not above. (Tr. 286-88) (TMA surgical records); (Tr. 466) ("left forefoot amputation"); *see also* Thomas Stedman, *Stedman's Medical Dictionary* (*Stedman's*), 545340 (27th ed. 2000) (The term 'meta' is "a prefix denoting the concept of after, subsequent to, behind, or hindmost.").

Listing 8.04 requires "extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R., pt. 404, subpt. P, app. 1 § 8.04. Extensive skin lesions "involve multiple body sites or critical body areas, and result in a very serious limitation." *Id*. § 8.00(C)(1). Examples of extensive skin lesions include:

---

[3] *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) ("the tarsal region (i.e., the ankle)"); *see also* Thomas Stedman, *Stedman's Medical Dictionary* (*Stedman's*), 113360 (27th ed. 2000) (The tarsal bones consist of the seven bones of the instep: talus, calcaneus, navicular, three cuneiform (wedge), and cuboid bones."); *Stedman's* at 896370 (defining 'talus' as the "bone of the foot that articulates superiorly with the tibia and fibula to form the ankle joint"); *Stedman's* at 111810 (ankle bone is synonymous with talus).

a.      Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.

b.      Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.

c.      Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

*Id*. § 8.00(C)(1)(a-c).  Given this criteria, the Court finds any error by the ALJ is harmless as Plaintiff cannot meet Listing 8.04.

First, Plaintiff failed to follow his prescribed treatment.  And so he cannot show that any ulcers persisted despite continuing treatment as prescribed.  The record documents a history of noncompliance with treatment prescribed by the diabetic foot clinic. Despite the insistence of his doctors, Plaintiff consistently failed to wear his orthotic shoes "at all times" (Tr. 334), which were prescribed to prevent ulcerations and further injury to both feet. (Tr. 333, 334, 337, 366, 442, 445).  He also failed to attend treatments scheduled in February and March. (Tr. 322, 323, 448).

Next, Plaintiff has not produced evidence to satisfy the temporal requirement of Listing 8.04.  Plaintiff contends his right toe ulcer was first treated on December 22, 2010 (Tr. 341) and persisted until April of 2011 — in other words, it persisted for over 3 months.  But instead, his records show consistent improvement as opposed to persistence, in spite of issues with treatment compliance. (Tr. 337) ("ulcer slowly contracting" in size at his second appointment on January 3, 2011); (Tr. 334) (ulcer shrinking in size; erythema improved, despite Plaintiff "walking barefoot" at his third appointment on January 10, 2011); (Tr. 331) (ulcer shrinking in size at his fourth appointment on January 20, 2011); (Tr. 328) (ulcer slowly contracting at his fifth

appointment on February 3, 2011); (Tr. 325) (size of ulcer was smaller at his sixth appointment on February 17, 2011 than at any earlier appointment).

Beyond that, Plaintiff's last documented treatment record for his right toe ulcer is dated February 17, 2011—less than two months after his initial treatment on December 22, 2011. (Tr. 325, 341). After February 17, 2011, Plaintiff rescheduled his February 24, 2011 follow-up appointment for March 3, 2011 (Tr. 323).[4] He then missed his March 3, 2011 appointment (Tr. 322), as well as his next appointment scheduled for March 29, 2011 (Tr. 448). By the time Plaintiff attended his April 14, 2011 consultative examine with Dr. Fote, no diabetic ulcers were noted on either foot. (Dr. Fote's CE, Tr. 361) ("Skin: No rashes or ulcerations."); (Dr. Fote's CE, Tr. 362) ("Lower Ext: . . . There are no skin color changes, varicosities, ulcerations or claudication."). And so, Plaintiff cannot show that his ulcers persisted for more than 3 months despite treatment. The record does not support a finding that plaintiff meets or medically equals Listing 8.04.

Listing 11.14 relates to peripheral neuropathies "with disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.14. Listing 11.04B describes "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" and directs adjudicators to Listing 11.00C for further instruction. *Id.* at § 11.04B. Listing 11.00C explains persistent disorganization of motor function as:

> [P]aresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. Generally, the assessment of impairment depends on the

---

[4] Plaintiff legitimately rescheduled his February 24, 2011 appointment as he was hospitalized between February 23, 2011 and February 26, 2011 for diabetic ketoacidosis. (Tr. 313-316). Treatment notes during Plaintiff's hospitalization only note the presence of a "[t]iny ulcer on the right second toe." (Tr. 315).

degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

Paralysis is the loss of voluntary muscle action, while paresis is synonymous with reduced muscle action and weakness. Dan J. Tennenhouse, 1 *Attorney's Medical Deskbook* § 13:24 (4th ed.). A tremor is defined as "[r]epetitive, often regular, oscillatory movements caused by alternate, or synchronous, but irregular contraction of opposing muscle groups; usually involuntary." *Stedman's* at 935100. Ataxis describes the "inability to coordinate muscle activity during voluntary movement; most often results from disorders of the cerebellum or the posterior columns of the spinal cord; may involve the limbs, head, or trunk." *Stedman's* at 81810.

Plaintiff has neurological deficits resulting in a loss of protective sensation to both feet. (Tr. 468). Nonetheless, he still does not meet or equal Listing 11.14 because he has consistently failed to comply with prescribed treatment and his symptoms and limitations are not of consistent severity.

Listings 11.14 and 11.04B both require disorganization of motor function. But unlike Listing 11.04B, Listing 11.14 requires that it persist, *despite* the claimant following his or her prescribed treatment. Plaintiff has consistently been advised that he must wear his prescribed orthotic footwear to prevent further injury and ulcerations. (Tr. 333) ("No barefoot walking!!"); (Tr. 334) ("Pt walking barefoot . . . instructed to wear authorized footwear at all times"); (Tr. 337) ("tennis shoe on left with excessive wear"); (Tr. 366) (Plaintiff "has been advised of the risks of wearing inappropriate footwear and instructed to purchase footwear for modifications. He will always require modified footwear to prevent injury."); (Tr. 442) ("Tennis shoes with inadequate off-loading; pt admits to walking barefoot. Pt did not purchase footwear as instructed."); (Tr. 445) ("Tennis shoes inadequate for TMA; pt wearing tennis shoes but advised to purchase footwear for modifications"); (Tr. 322, 323, 448) (failed to attend appointments).

In addition to following prescribed treatment, Listing 11.14 requires a claimant to have a diagnosis of peripheral neuropathy that results in disorganized motor function. While there is no question that Plaintiff suffered from peripheral neuropathy and demonstrated loss of protective sensation bilaterally, the record does not support significant and persistent disorganization of motor function.

During Plaintiff's consultation examination with Dr. Fote on April 21, 2012, Plaintiff denied any weakness in his lower extremities. (Tr. 361). Examination of Plaintiff's lower extremities showed that his deep tendon reflexes were normal at 2+, muscle strength was 5/5 and light touch sensation was intact, bilaterally. (Tr. 362). Between December 22, 2010 and April 3, 2012, medical providers at the Diabetic Foot Clinic found a combination of the following: no absent pulses (Tr. 325, 328, 331, 334, 337); intact dorsal pedal and posterior tibia pulses (Tr. 436); no muscle weakness (Tr. 328, 331, 337); range of motion within normal limits and 5/5 muscle strength on the right lower extremity (Tr. 341, 436); and range of motion within functional limits and 5/5 muscle strength on the left lower extremity (Tr. 341, 436).

Plaintiff had a normal standing balance and nonantalgic gait with lesions on December 22, 2010. (Tr. 341). Despite seeking treatment for foot-related impairments, his doctors continuously did not consider him a fall risk. (Tr. 326, 329, 332, 335, 338, 439, 441, 443, 453, 458, 462). During Plaintiff's consultative examination with Dr. Fote on April 21, 2012, Plaintiff denied any weakness, walked with a slight limp but without using any assistive device, and climbed on and off of the exam table without assistance. (Tr. 361). Plaintiff presented to the Diabetic Foot Clinic in crutches for his April 3, 2012 initial evaluation of a right foot infection and ulcer. (Tr. 436). However, the record does not show that any treating physician prescribed

the crutches.  Instead, Plaintiff's doctors prescribed a walking splint on April 3, 2012 to be worn on his right foot. (Tr. 436-37).

Considering this evidence and the record as a whole, the record does not support a finding that Plaintiff meets any listed impairment.  The ALJ's error at step 3 was harmless and does not warrant the relief requested.

### C.    Residual Functional Capacity and Credibility Assessments

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's RFC decision can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her decision or all the evidence that he or she rejected. *Falco*, 27 F.3d at 163-64.  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The court "may only scrutinize the record" and take into account whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision. *Leggett*, 67 F.3d at 564.  Accordingly, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. *Johnson*, 864 F.2d at 343-44.

A claimant's credibility is considered as part of the overall RFC assessment.  The Administration requires the decision to "contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7P, 1996 WL 374186, at *4 (July 2, 1996).  At the same time, "[p]rocedural perfection in administrative proceedings is not required" and remand will not be warranted "unless the substantial rights of a party have been affected."

*Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *see also Haywood v. Sullivan*, 888 F.2d 1463, 1469-70 (5th Cir. 1989) (failure to explain credibility findings was harmless error where decision summarized claimant's testimony and objective medical evidence and substantial evidence supported finding); *Story v. Astrue*, 294 F. App'x 883, 884 (5th Cir. 2008) (ALJ's consideration of subjective testimony "satisfied his obligation" to make specific credibility findings); *Salgado v. Astrue*, 271 F. App'x 456, 462-63 (5th Cir. 2008) (ALJ's previous discussion of claimant's allegations provided sufficient reasons for otherwise conclusory credibility finding).

The ALJ determined Plaintiff's alleged limitations were not fully credible because he had the residual functional capacity to perform the full range of sedentary work. Sedentary work requires occasional walking and standing and "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a); 20 C.F.R. 416.967(a).

Plaintiff contends that the medical evidence along with his testimony "prove significant nonexertional limitations with respect to [his] ability to bend, stoop and balance," all of which preclude the performance of sedentary work. (R. Doc. 12 at 18). The ALJ, however, "quantified [none of these] particular limitations in his RFC." (R. Doc. 12 at 18). Instead, the ALJ did not mention his balancing limitations and incorrectly found his "inability to do prolonged stooping and bending" were consistent with performing the full range of sedentary work. (R. Doc. 12 at 18).

As an initial matter, Plaintiff's treating podiatrist, Dr. Ly Vu, advised that Plaintiff's impairments prevent him from stooping or bending for "prolonged" periods of time. (Tr. 366). The ALJ accepted this opinion and Plaintiff does not argue that his ability to stoop or bend is

actually more limited than Dr. Vu advised. The only argument raised is that an inability to do prolonged bending and stooping would preclude the performance of sedentary work. This argument, however, is legally incorrect.

"An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations." SSR 96-9P, 1996 WL 374185, at *8 (July 2, 1996). The ability to stoop incorporates the ability the bend. *See Frustaglia v. Secretary of Health and Human Services*, 829 F.2d 192, 195 (1st Cir. 1987) (stooping means to "bend forward from the waist"). Therefore, an inability to stoop or bend for *prolonged* periods of time would not significantly erode the occupational base for sedentary work, as Plaintiff claims. Instead, only a "complete inability to stoop would erode the unskilled sedentary occupational base." SSR 96-9P, 1996 WL 374185, at *8 (July 2, 1996). And so, Plaintiff is incorrect that his limitations in prolonged bending and stooping preclude the performance of or erode the occupational base for sedentary work.

Next, Plaintiff suggests the ALJ erred by not specifically quantifying and incorporating his balancing limitations in the RFC. Plaintiff claims that he has had significant balancing limitations since undergoing a transmetatarsal amputation of the left forefoot in June of 2009. (R. Doc. 12 at 17-18); (Tr. 286-88). As support, he cites his left transmetatarsal amputation, loss of protective sensation, diabetic ulcers, and his own testimony explaining: "when I lost my toes it was very difficult to hold balance because all my weight had shifted . . . I will fall because I just don't have the balance to be able to equal out the weight of anything I try to pick up." (R. Doc. 12 at 17).

At the outset, the Court recognizes that the record shows some degree of limitation in terms of balancing and walking. For example, in a letter to the Appeals Council dated October

18, 2012, Plaintiff's treating podiatrist, Dr. Ly Vu, reported that Plaintiff "has a great toe amputation with limited balance and impaired gait." (Tr. 469). Dr. Vu's earlier records note sporadic issues with gait. On August 19, 2011 Dr. Vu advised that Plaintiff was "limited in activities that require prolonged standing or ambulation." (Tr. 366). On April 3, 2012, Dr. Vu's records note that Plaintiff showed up at his appointment using crutches to ambulate after stepping on a nail and developing a foot ulcer. (Tr. 435-37). At the end of that appointment, Dr. Vu prescribed a short leg splint for Plaintiff's right leg. (Tr. 436). However, the record does not show that any physician prescribed or advised the use of crutches. Plaintiff has also been prescribed orthotic footwear for both feet (Tr. 325, 328, 331, 334, 337, 341, 366, 445). And so, Plaintiff does exhibit symptoms of impaired balance, which also effects ambulation. Even still, these limitations are not severe enough to preclude the performance of sedentary work.

The remaining record provides further support for the ALJ's finding that Plaintiff could perform sedentary work, despite his limitations. Treatment records from the diabetic foot clinic show Plaintiff had normal standing balance, a nonantalgic gait with lesions and ambulation distance was "unlimited" on December 22, 2010. (Tr. 341). On 6 out of 8 visits to the Diabetic Foot Clinic between December 2010 and April 2012, treatment records note that Plaintiff was not considered a "fall risk." (Tr. 435, 439, 441, 443, 446, 453, 458, 462). Plaintiff was examined by Dr. Barnabos Fote on April 14, 2011 at the Commissioner's request. (Tr. 360-63). Dr. Fote observed that Plaintiff walked in and out of the room without assistance and climbed on and off of the exam table without assistance. (Tr. 361). Dr. Fote also noted that Plaintiff walked with a slight limp. (Tr. 361). Plaintiff could not toe-walk due to his amputation, but his heel-walk and squat were both normal. (Tr. 362). Plaintiff's range of motion was "within normal limits" for all joints bilaterally. (Tr. 363). On August 19, 2010, Dr. Linda Stewart reported that Plaintiff "can

ambulate with his [prescribed orthodic] shoe." (Tr. 466). And although he exhibited poor balance, he had a negative Romberg test, which is consistent with the RFC. (Tr. 466). *See Grebenick v. Chater*, 121 F.3d 1193, 1196 n.3 (8th Cir. 1997) ("The 'Romberg sign' is the inability to stand (feet together or slightly less than shoulder width apart) without becoming unsteady, swaying, or falling over."); 1 Dan J. Tennenhouse, *Attorney's Medical Deskbook* § 13:2.10 (4th ed.) (Romberg test is used during neurological exams to measure balance).

Plaintiff underwent a transmetatarsal amputation of his left forefoot on June 23, 2009 which allegedly affected his ability to balance, including walking and picking up objects. (Tr. 286-88). The ALJ properly rejected Plaintiff's allegations based on the record. Following his amputation, he continued working in jobs that were considered "medium" for more than a year and half after his surgery (Tr. 27-28, 43, 153-55, 163). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Given the exertional demands of medium work, this evidence is not consistent with Plaintiff's alleged inability to balance, pick up objects or walk beginning in June of 2009.

At the Diabetic Nutrition Clinic on March 21, 2011, Plaintiff advised that he did not have any special needs, including limited mobility, and did not require any assistance at home. (Tr. 449). He also informed the nutritionist that he rode his bike for 30 minutes at a time, 3 to 4 times a week. (Tr. 449). The nutritionist likewise instructed Plaintiff to exercise 3 to 4 times a week for 20 to 30 minutes at a time. (Tr. 451). Treatment records from February of 2011 show that Plaintiff was instructed to engage in activities as tolerated upon being discharged from the hospital for diabetic ketoacidosis. (Tr. 313, 316).

Plaintiff's own testimony is likewise consistent with an RFC of sedentary work. In his Functional Report (Tr. 171-78) Plaintiff reported tending to his personal needs without assistance, preparing meals, performing small household chores and taking care of his small children. (Tr. 172-74). He drives on a daily basis, shops for groceries and household items, attends church and visits with his family and friends. (Tr. 174-75). He does not need assistance or encouragement to perform any of these activities. According to Plaintiff, he could walk for ¼ of a mile before resting for 10-20 minutes, but he was not limited in sitting. (Tr. 176). At the hearing, Plaintiff said he could stand for 20-25 minutes at a time. (Tr. 29). He explained that he uses crutches only when he has an ulcer to relieve pressure and aide healing. (Tr. 33, 34, 36). Despite his foot impairments, Plaintiff is able to take care of two "very active little boys" ages 3 and 7. (Tr. 25, 39). He drives his 7 year old to school in the mornings and then stays at home taking care of his three year old all day. (Tr. 37, 202, 205).

Considering the objective medical evidence, and Plaintiff's activities of daily living, the Court finds substantial evidence supports the ALJ's finding that Plaintiff's allegations were not fully credible and that Plaintiff could perform the full range of sedentary work.

### D. Medical Vocational Guidelines

Plaintiff claims the ALJ committed reversible error in applying the GRIDS because he suffers from "significant nonexertional limitations with respect to [his] ability to bend, stoop and balance" that significantly erode the occupational base for sedentary work. (R. Doc. 12 at 18). Plaintiff contends the ALJ erred in failing to incorporate any balancing, stooping or bending limitations into the RFC and relying exclusively on the GRIDS to direct a finding of not disabled. Plaintiff correctly identifies the lack of quantifiable nonexertional limitations in the RFC. The ALJ failed to incorporate these alleged limitations, however, because he determined

they were not credible.  The Court has found that the ALJ's RFC determination, without the limitations alleged by Plaintiff, was supported by substantial evidence.

Setting aside the fact that substantial evidence supports the ALJ's RFC, Plaintiff is incorrect that the mere presence of non-exertional limitations would automatically preclude application of the GRIDS.  Instead, the GRIDS may be used as long as the degree of non-exertional limitations is within the confines of sedentary work. SSR 96-9P, 1996 WL 374185, at *4 (July 2, 1996) (To apply the GRIDS, an "individual must also have no impairment that restricts the nonexertional capabilities to a level below those needed to perform unskilled work, in this case, at the sedentary level.").  "Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling" — like the ones mentioned by Plaintiff — "would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." SSR 96-9P, 1996 WL 374185, at *7.

Therefore, Plaintiff's allegation of reversible error is without merit as the GRIDS may be used where non-exertional impairments, even severe, do not significantly reduce the relevant occupational base.

## V.  CONCLUSION

For the reasons given above, the Court recommends that the Commissioner's decision be **AFFIRMED** and Plaintiff's appeal be **DISMISSED with prejudice**.

Signed in Baton Rouge, Louisiana, on February 10, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**